**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Hussain Shaffi, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs | ) | Case No: 1:24-cv-02554-BAH |
| | ) | |
| Leidos, Inc. | ) | |
| Leidos Biomedical Research, Inc. | ) | |
| | ) | |
| | ) | |
| Defendants | ) | December 2, 2024 |

Serve Defendants on:
The Corporation Trust, Inc.
2405 York Road, Suite 201
Lutherville Timonium, MD 21093-2264

**FIRST AMENDED COMPLAINT**

**INTRODUCTION**

1. This is an action for monetary damages, to redress Defendants' unlawful employment practices against Plaintiff, including its discriminatory treatment and harassment of Plaintiff due to his national origin, religion and its unlawful retaliation against him after he complained about quality assurance problems in the workplace in violation of Section 1981 and 1983 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981") and § 1983 ("Section 1983")

2. Plaintiff Hussain Shaffi was forced to resign from his position as a Quality Assurance Specialist IV at Leidos (hereinafter "the event") serving the National Laboratory for Cancer Research in Frederick, MD in the Vaccines, Immunity, Cancer, Department, VICD.

3. At all times mentioned herein, Leidos, Inc. and its subsidiary Leidos Biomedical Research, Inc. (hereinafter collectively "Defendants") employed executives that supervised Plaintiff and subsequently interviewed Plaintiff for alternate positions with Defendant and its group of companies.

4. Shaffi, along with other employees, discovered loss of COVID donors' samples including four months of work/data that was destined for FDA for determining the impact of COVID future approaches including vaccines and reported it to his supervisor.

5. At all times herein, Defendants knew or should have known of the conduct of their executives and supervisory employees.

6. Plaintiff's immediate supervisor Dr. Ligia A. Pinto exhibited hostility towards him during his employment after April 2023.

7. Dr. Pinto retaliated against Plaintiff like she did against others, by taking adverse action against him for exposing deletion of data dealing with COVID.

8. An adverse action is an action which would dissuade a reasonable employee from raising a concern about a possible violation or engaging in other related protected activity. Retaliation can have a negative impact on overall employee morale.

9. As a result of the discriminatory treatment, Plaintiff sustained extensive damages, including both physical ailments and emotional distress.

10. As a result, Plaintiff has been unable to secure alternate employment for the same salary, facing around a 30 (thirty) percent cut.

11. After his demotion, Plaintiff's work environment became unbearable, and he sought medical accommodation or hybrid work but was denied by his supervisor. Following doctor's note, HR emailed the plaintiff dated Jan 22, 2024, with attached Americans

with Disabilities Act (ADA) and Section 503 of the Rehabilitation Act forms and asked the doctor to complete or the consequence would jeopardize the plaintiff's employment by Feb 5, 2024.

12. After seeking mitigation through interviewing for 4 (four) alternate positions within Leidos' group of companies which were denied, he was forced to resign.

13. From the beginning of his complaints, Defendants' practices were clearly unlawful.

14. Representative Shaffi, a Muslim and Asian origin employee faced discrimination by Leidos supervisors, particularly Dr. Pinto.

15. As a result, Representative Shaffi suffered severe emotional distress, anxiety, depression, and heart ailments.

16. Upon information and belief, Leidos has a history of mistreating employees of color, especially those of the Muslim faith.

## PARTIES

17. Plaintiff, Hussain Shaffi, is a resident of the Commonwealth of Virginia.

18. Defendant Leidos managed a contract at US government facilities in Maryland where Plaintiff worked and has availed itself in this District.

19. Defendant Leidos Biomedical research, Inc. employed Defendant as a contractor for the National Institutes of Health (NIH) in this District.

20. Plaintiff is informed and believes and thereon alleges that at all times relevant herein, Defendants' employees were acting within the course and scope of their respective relationships with Defendant.

21. Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII").

22. The plaintiff has sought and received a Right to Sue letter from the EEOC.

## JURISDICTION AND VENUE

23. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question).

24. Venue is proper in the United States District Court of the District of Maryland pursuant to 28 U.S.C. § 1391(b)(1) as the District of Maryland is "a judicial district in which any defendant resides" and the corporate "Defendant [is a] resident of the State in which the district is located."

25. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as the District of Maryland is "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"

## FACTUAL BACKGROUND

26. Plaintiff was employed by Defendant Leidos Biomedical Research, Inc., a subsidiary of Leidos, Inc. to provide quality assurance services at federal agencies in Maryland.

27. In consideration for his services, Shaffi earned a salary exceeding $100,000 per year.

28. Upon information and belief, Shaffi was a punctual and diligent employee, seeking compliance with quality assurance standards within the National Institutes of Health facilities in Maryland.

29. An independent subcontractor PPD (Pharmaceutical Product Development) was hired by the defendant in 2021 before the Plaintiff was hired in Feb 2021-hundreds of thousands of dollars were spent by the VICD. There was a total of three virtual audits

by the PPD between February 2021 to May 2023. The purpose of the PPD audits was to evaluate the implementation of GCLPs (Good Clinical Laboratory Practice) that were not rooted within the VICD. The Plaintiff created the department of Quality Assurance, hired a competent Quality Assurance Auditor, and implemented the GCLPs within the VICD.

30. However, the plaintiff realized as time progressed that Dr. Pinto was not interested in the GCLPs (Good Clinical Laboratory Practice) and in fact it was a mere "rubber stamp" to gain additional funding for the VICD. In an email dated September 14, 2021, Dr. Pinto indicated to the Plaintiff that the person to whom he was to report ("Direct Report") whose title was Quality Assurance Auditor II "was not hired as an auditor or inspector." She said the same thing in the last meeting on January 9, 2024, with an HR representative and the Plaintiff. In this meeting she said that Plaintiff was not hired as a Quality Assurance person but was expected to do all the Laboratory operations as well. The Plaintiff's concern was and still is 'Conflict of Interest'.

31. An email from Dr. Pinto dated May 20, 2022, Transition of Quality Control Manager, who reported to the Plaintiff from February 2021, was now transferred under Scientific Manager. This move was due in fact due to the Quality Control Manager's close association with Ligia Pinto as she was the informer of all the activities of each person at the VICD. This desire of the Quality Control Manager to move up within the VICD with the help of Dr. Pinto was achieved. This move resulted in Plaintiff's other Direct Report taking a transfer (due to constant insults from Dr. Pinto in meetings) to another department and the plaintiff's demotion was enacted. After the departure of the Plaintiff's Direct Report there were two people (1 Quality Control Analyst, 1 Quality Assurance

Auditor) hired in April 2023 that reported to the Quality Control Manager not the plaintiff. In April 2023, the spreadsheet was created, and the defendant came all out to get rid of the plaintiff-the silent firing from the time of COVID data breach was now an active vengeance on the part of Dr. Pinto. She also asked the Plaintiff to upgrade the review for the Quality Control manager when she was reporting to the plaintiff.

32. Plaintiff's supervisor at Leidos, Dr. Pinto on July 18, 2023, included a scientific manager in meetings from that point on. When the plaintiff asked about the replacement for directly reporting to her, Dr. Pinto replied, "… eventually a quality auditor will be hired but he or she will not report to you."

33. Dr. Pinto several times told the plaintiff that his Direct Report "has to go." In one of the meetings, she said that Plaintiff's Direct Report would say things against Leidos to FDA if they ever showed up at the site. She asked the Plaintiff to downgrade the annual review and wrote down points as to what changes were needed in the Plaintiff's Direct Report 'self-assessment' as she did not want HR to know what the Plaintiff had written about his achievements for the year.

34. Plaintiff was summoned by Dr. Pinto on September 25, 2023 regarding an earlier same day meeting of the plaintiff with the Scientific manager, Quality Control manager and the two new hires-quality control analyst and Quality Assurance auditor where the Plaintiff was told to make entries to raw data representing a conflict of interest and non-compliance with Quality Assurance. Such entries could land a quality assurance person in serious legal trouble. Dr. Pinti told Plaintiff "You go find something and leave." Later that morning Plaintiff met the HR director, indicating that a 'posse' was after him to which the HR director said that they were already after Dr. Pinto and things would

improve for the Plaintiff, which never did. Dr. Pinto emailed Plaintiff that afternoon after the above meeting to reiterate where she mentioned that plaintiff needs to behave in a "collegial and professional manner. We will be reviewing this on a regular basis. Let me know if there are any questions". Neither side was ever invited to see what had happened in the prior meeting.

35. There was a total of ten meetings with HR where Plaintiff was assured that Dr. Pinto's supervisor Dr. Leonard Freedman was also looking into the matter regarding her bullying. The HR director also indicated that HR was moving "fast and furious" against Dr. Pinto.

36. Defendants failed to follow up on a meeting with "Ethics and Compliance" where the Chief Ethics and Compliance Officer assured Plaintiff that recommendation will be made to Dr. Pinto to stop the harassment.

37. The organizational chart was not shown to Plaintiff after April 2023, despite several requests to the Administrative Director that maintained the organizational chart.

38. Dr. Pinto called the Plaintiff for an urgent meeting on April 4, 2023, regarding Plaintiff's colleague, a female, Asian Quality Control Analyst and stated that the woman "… was toxic to the department." Dr. Pinto said the same 'toxic' comment on the woman's face before calling the Plaintiff for the meeting. The woman took a transfer to another department. However, before leaving she complained to HR & Ethics and Compliance about the harassment, she faced within the VICD.

39. The doctor's medical note dated January 10, 2024, indicates that the stress level on Plaintiff intensified due to verbal abuse, assigning tasks impossible to complete within the given time frame by Dr. Pinto.

40. This hostile work environment was not only detrimental to Plaintiff's mental well-being but also exacerbated his existing physical pain issues.

41. The daily commute to work and denial of Dr Pinto for the Plaintiff work remotely at least once a week added physical aggravation to Plaintiff's neck and back condition.

### COUNT I
### 42 U.S.C. § 1983

42. Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

43. From the initial assignment of "busy work" on needless spreadsheets, Defendants' supervisory employees Dr. Pinto, a Scientific Manager, and a Quality Control Manager subjected Plaintiff to treatment not afforded to other non-minority employees by unfairly assigning tasks and harassing Plaintiff for not completing them.

44. In many instances of conduct by Leidos employees, they have treated individuals of Asian background and of the Muslim faith like Plaintiff to a much lesser degree than in individuals of other religions and faiths.

45. Defendants failed to articulate deficiencies in Plaintiff's work performance justifying changes to inferior work roles.

46. As a result of Leidos' actions of discrimination against Plaintiff Shaffi, he suffered mental and physical injuries and loss of wages in an amount to be determined at trial.

## COUNT II
### Retaliation in Violation of Section 1981

47. Plaintiff realleges and incorporate by reference each and every allegation contained in the foregoing paragraphs as though fully set forth.

48. Defendants violated Section 1981 by subjecting Plaintiff to retaliation for his protected complaints and opposition to Dr. Pinto's discriminatory comments on the basis of race and ethnicity, by effectively terminating Plaintiff's employment with the Company.

49. Plaintiff was unable to secure alternate employment although he was qualified for the four positions, he applied for at Leidos and its group of companies. These actions were a clear mistreatment of Shaffi and also affected his ability to mitigate the damage done to him.

50. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

51. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

52. Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff, and was

done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests that this Court:

1. For compensatory, general, statutory, and special damages against Defendant in amounts to be proven at trial.

2. Punitive and exemplary damages against individually named Defendant in an amount appropriate to punish Defendant and deter others from engaging in similar misconduct.

3. Lost wages and benefits, compensation for physical pain and mental suffering, and loss of career opportunities.

4. Prejudgment interest.

5. For costs of suit and reasonable attorneys' fees and costs as authorized by statute or law.

6. For restitution as the Court deems just and proper.

7. For such other relief, including injunctive and/or declaratory relief, as the Court may deem proper.

**JURY TRIAL DEMANDED**

PLAINTIFF DEMANDS A JURY BY TRIAL ON ALL COUNTS.

Respectfully submitted,

_FMG_____
Faisal Gill (Bar #28806)
Gill Law Firm
1717 Pennsylvania Ave NW
Suite 1050
Washington DC 20006
310-418-6675
Fgill@glawoffice.com